Team 1485, ARCH Development v. OSI Pharmaceuticals Team 1485, ARCH Development v. OSI Pharmaceuticals, LLC Good morning. May it please the court, Peter Sullivan for Dana-Farber Cancer Institute and ARCH Development. There are three points on appeal. I'm going to start with the Okanagan grounds. The board below found that the combination of Okanagan, Sinev, Friedman, and Tan in light of the knowledge of a person of ordinary skill in the art rendered claims 1, 2, 3, and 5 of the 512 patent obvious. And as part of that determination, there was an issue that I want to focus on. It's that the board held that a person of ordinary skill in the art knew that UCN01 was a tyrosine kinase inhibitor in humans and animals. And that's with respect to CSARC, but also with respect to other tyrosine kinase inhibitors. We submit that that was a decision without substantial evidence in the record. Now there are three inferential jumps that the board makes in connection with finding that UCN01 is a tyrosine kinase inhibitor. It starts with Okanagan. The Okanagan reference reports that there is inhibition of something called V, viral SARC. V-SARC is a mutant kinase that is found in the Rouse sarcoma chicken virus. It's found in chickens. It's not found in humans. And Okanagan reported that in a test of the actual substrate of V-SARC, not in cells, but like an in vitro test of the substrate, that there was inhibition by UCN01. The rest of the art that's used in order to come to the conclusion that UCN01 is a tyrosine kinase inhibitor in humans and in animals comes largely from expert testimony and storosporine art. And storosporine is another drug, another treatment drug, that has a structural similarity to UCN01, but they're not the same. Close structural similarity. Yes. And you sort of semi disparaged the testimony, but the testimony counts and was believed. It was believed that there's structural similarity, and that may lead someone to look at that drug. But the conclusion that was made, Your Honor, is that that drug would act the same way as UCN01. And that's a leap too far. And what we pointed out below to the board was that there's actually record evidence in another Okanagan reference. It's Okanagan 1991. And that reference actually compared UCN01 to storosporine. It showed there was a host of differences having to do with specificity, potency, activity, the kinds of things that you worry about when you're trying to figure out whether something inhibits tyrosine kinases. So storosporine was shown to not be similar in its function to UCN01. The other piece of evidence that was used to support a conclusion that UCN01 was a tyrosine kinase inhibitor was reference to Robinson. Robinson is also a storosporine reference. It's actually the goal of the investigators in Robinson. What about the SNAEV reference, if I've not mispronounced it? We're all just guessing about that, Judge. SNAEV is a UCN01 reference. That reference talks about four unknown proteins. And it finds in one of its tests that there's phosphorylation. What phosphorylation will tell you is that that may be an indication that there is tyrosine kinase inhibition taking place. But it can also be increased phosphatase activity. And both experts agreed that you need to understand whether there was increased phosphatase activity before you can conclude that this was tyrosine kinase inhibition. This pattern is expired, correct? It is. Dr. Alan Eastman's testimony on that point is found at appendix 2135, lines 9 to 15. And SNAEV and Akinaga are the only two UCN01 references. The rest of them are storosporine references. And storosporin differs from UCN only by a hydroxyl group. Pretty close. Right. Exactly. Let me get the actual statement about the difference. Because it notes that the difference actually, in Akinaga 91, the investigators note that that actual difference in hydroxyl may be the precise reason why there's a difference in function. Okay. So insofar as it's different, that difference was being ascribed as the reason why storosporine doesn't act the same way that UCN01 does. Since it's the only difference between the two, it would have to be inferentially the basis for a difference in function, right? That's what the investigators said. And I would agree with that presumption. Okay. There are two other grounds. One is an alternative ground for relief based on the Hamna Art. And then there's a constitutional argument that we've raised. So going to the Hamna grounds. The person of ordinary skill in the art. The grounds for Hamna were a person of ordinary skill in the art plus Hamna plus McGann would render the claims that asserted of the Fafel patent invalid. And the board correctly noted that the term cell death and apoptosis should be equated to cell killing. And it should not be broadened to include induction of a differentiation pathway. And in that case, as Judge Lori mentioned, this is an expired patent. The claim construction was on the basis of Phillips. And in this case, the board construed that cell death was not to include differentiation. And the reason why that's important is Hamna's art talks about converting benzidine negative cells to benzidine positive cells. Taking cancerous cells and converting them to non-cancerous cells. It doesn't talk of cell killing. So because the board construed the claims to exclude differentiation, that was the basis for concluding that the Hamna art would not be relevant. And the board would not reject or find unpatentable the claims on the basis of the Hamna art. You mentioned a constitutional argument. We've already held that reexamining a granted patent is not a taking or is not unlawful. Right. That's in the Patlick's decision, Your Honor. Yes. As we mentioned in our reply brief, the Patlick's decision relied in part on Supreme Court precedent that included a substantially advanced aspect of the takings clause. Subsequent Supreme Court cases, including the Lingle case, L-I-N-G-L versus Chevron, held that in a takings clause, we presume that the Congress provided an adequate basis and has a law that's appropriate. Whereas in a due process case, you look at both the government's interest and whether it was a rational basis to achieve that interest. To the extent Patlick's is relying on cases involving substantial advances and the policy behind the legislation, it can be reexamined because that law is no longer right. And the Supreme Court took pains to correct that law in the Lingle case. So our position is that Patlick's can be reexamined in light of the Supreme Court case and the takings clause case can be decided. As I said, the constitutional law issue involves both the due process and takings clause. Both of those... Well, it's certainly due process in the extensive reexamination of review process. I'm sorry, Your Honor. It's certainly due process in the IPR process. We're arguing substantial substantive due process, which is rarely granted. We understand that. The basis is whether there is a legitimate government interest and a rational basis to go forward. The government's interest as expressed through this court and through Congress, looking at the statute, has been that there is both dubious patents out there and that we want to strengthen the patent community. And we submit that IPRs do not have a rational basis for that second part. There is nothing in the IPR statute that strengthens already valid patents. We can be examined. This patent's expired, but you can take a patent. You can have it examined in IPR by a party, and then you can come through that, and then another party can come right back. There's no super presumption of validity. There's nothing that says, okay, we went through this process. Now it's stronger. No, it's just subject to more and more challenges. We submit that that means that that second part that Congress talked about wasn't met in the IPR challenge. And for those who had applied for patents under the prior regime, it's unfair for them to be subjected to this new process. I see I'm in my— Okay, let's hear from the other side. Thank you. So you are splitting time with the government? That's correct, Your Honor. And they are arguing just the constitutionality question? That's correct, Your Honor. May it please the court, Brian Matsui, and I am presenting argument for both appellees here, and I'm going to address the patentability issues. This is a straightforward substantial evidence appeal. Even though the board made numerous factual findings based upon the prior art, adopted our claim charts in full, credited our expert in his 114-page declaration, and found Arch's expert in his seven-page declaration not persuasive, Arch raises no legal challenges to patentability. Instead, it raises two narrow substantial evidence issues. There's substantial evidence to support both of the findings that Arch challenges, but the court only needs to address one to affirm on the patentability issues, and that's that UCN01 is a tyrosine kinase inhibitor. And we know that UCN01 is a tyrosine kinase inhibitor because, as the board found, Okanaga says so. It says that at Appendix 32 and Appendix 29, that Table 1 in Okanaga expressly states that UCN01 inhibits VSRC. But that's VSRC, not CSRC. That's correct, Your Honor. Their argument is predicated entirely on the distinction. That's true, but Okanaga says that VSRC is a tyrosine kinase, and the 512 patent itself says that VSRC is a tyrosine kinase. So you don't think that the inference needs to be made that CSRC is the same as VSRC? Not when at Column 19, Line 28, the patent discloses that genistein, a compound, is a tyrosine kinase inhibitor because it inhibits VSRC. So the patent itself is treating VSRC as a tyrosine kinase inhibitor, as a tyrosine kinase. But more importantly, this is a factual finding here. The board found, as a matter of fact, at Appendix 33, that a person of ordinary skill in the art would understand that a compound that inhibits VSRC would inhibit CSRC. It found Dr. Keefe's testimony not persuasive, and it credited and quoted our expert's testimony, saying there are similarities between VSRC and CSRC, such that a skilled artisan would understand that the compound that inhibits VSRC also inhibits CSRC. That's one reason, in addition to the fact that Okanaga says VSRC is a tyrosine kinase, that their argument fails. But another reason why their argument fails is because of the Sine-Ave reference. The Sine-Ave reference says that UCN01, and the board made findings about this at Appendix 29 and at 33, that the Sine-Ave, sorry, 35, where the board said that Sine-Ave discloses that UCN01 inhibits multiple tyrosine, serine, threonine kinases. And it did experiment testing on human breast cancer cells to determine that it led to decreased tyrosine phosphorylation of at least four proteins when UCN01 is applied to human breast cancer cells. And the board found, as a matter of fact, based upon this reference, and based upon our expert's testimony, that a person of ordinary skill in the art would understand that UCN01 is a tyrosine kinase inhibitor. And that's being applied to cells right there. So that's additional substantial evidence that supports the board's decision here in this case, where they found Arches' expert's testimony not persuasive. That should resolve the appeal because there is no need then to look to any other art when you have references that explain that UCN01 is a tyrosine kinase inhibitor. And I think that it's important also to take a step back and look at what the board did here in this case. The board's rehearing decision, which Arches really wholly ignores, rejected the very premise of Arches' argument that its ruling depends upon any difference between VSRC and CSRC. I noticed some references to protein kinase inhibitor as opposed to tyrosine kinase. Tyrosine, of course, is not a protein. It's an amino acid, which is a component of a protein. Is that difference of any significance to us here? No, because the fact that UCN01 is also a protein kinase inhibitor doesn't mean that it's not a tyrosine kinase inhibitor as well. A lot of this art is showing that these compounds inhibit multiple different enzymes or proteins. And that's all that's being shown here. The board here had the evidence before it and made a determination on the facts based upon the significant evidence in the prior art and in our expert's testimony that UCN01 is a tyrosine kinase inhibitor. There's nothing in the 512 patent that requires a particular tyrosine kinase inhibitor. It just lists a number of examples. It doesn't say that it needs to inhibit tyrosine kinases with any sort of degree. It just says any tyrosine kinase inhibitor, any low molecular weight tyrosine kinase inhibitor. Now, I just would also like to briefly touch upon the motivation argument that Arch raises. Because, again, that's another issue that the court does not need to reach. Because, as Arch has said, you needed to look at the store's boring art in order to determine whether or not UCN01 is a tyrosine kinase inhibitor. But you don't need to do that because, again, Okanaga and Sineave explained that UCN01 is a tyrosine kinase inhibitor. And the board made a finding of that on its rehearing decision at 43 and 44 where it says its decision doesn't depend upon any of the store's boring art. So, given that, that's enough right there to affirm the board's decision. Now, the link between the VSRC and C is based on the testimony which the board accepted and believed. That's correct, Your Honor. And it's the same thing for the motivation argument. If the court needed to reach the motivation to combine argument, that's another factual finding that's supported by substantial evidence where the board found Arch's evidence not persuasive. It looked at the fact that our expert testified that UCN01 and store's boring have a similar mechanism of action. They both inhibit kinases by interfering with ATP binding. They both have similar effects on the cell cycle and they are structurally similar. The board was perfectly well within its rights to weigh that evidence and make a factual finding and determine that a person of ordinary skill in the art that has this Okanaga reference, which basically discloses, it does disclose everything, adding a DNA agent to a tyrosine kinase inhibitor to enhance cell death. A person of ordinary skill in the art that wanted to learn more about UCN01 would look at the store's boring art. If there are no further questions, we would ask the court to affirm. Thank you. Thank you, Your Honor. May it please the court. Catherine Allen on behalf of the United States. We intervene to address the constitutional issues. And I would just like to start out by responding to a couple of points that the other side made. First is that the due process question here is whether there is any rational basis for Congress's decision to apply inter parties review to patents that issue prior to the AIA. They agree that it serves the purpose of weeding out erroneously granted patents. That ends the due process question. Also, they dispute Pat Lex's citation of cases that look to congressional purpose. And I just want to point out that those citations are in the due process portion of the opinion. And there is no question that, sorry, there's no dispute that the due process question is whether Congress had a rational basis for this application of the statute. So Pat Lex is still good law on that issue. And we think it forecloses the due process question here. In addition, we think that there is no takings problem because the cancellation of a patent through IPR rests on a determination by the agency that the patent holder never had a valid property interest. And the patent wouldn't actually be canceled until this court affirms that determination. And in that sense, it's really no different than when a district court determines that a patent is invalid. What do you say as to the failure to raise this issue before the board? Had the issue been raised before the board, what would the board have been empowered to do about it? Yes, Your Honor. If the issue had been raised before the board and the board determined that the board agreed with the constitutional challenge, it could have declined to institute inter-parties review in this case. And so you think that this is something that needs to be raised prior to the institution of the IPR? Well, that would be the best time to raise it. But in addition, the board could terminate the proceedings and, in effect, reconsidering the institution decision if it was raised later in the proceedings. Do you think that the board, in effect, has the power to entertain a constitutional argument of this sort? It was a constitutional challenge to the statute that the board is charged with enforcing. Yes, Your Honor. I do think it does. Section 314A does not require the agency to institute inter-parties review in any case. So it's clear that the agency does have discretion, as the Supreme Court recognized in Quozo, to decline to institute. That decision is committed to the agency's discretion. And I would point out that the Supreme Court in Thunder Basin and, more recently, in 2012 in Elgin, made clear that the sometimes quoted statement that agencies don't have jurisdiction to consider constitutional issues is not mandatory. And we think here, just as in In re DBC, it would not have been futile for the party to raise it and, therefore, the issue should be considered forfeited. But just to finish the point, then, are you saying that the board does have the authority, quite independent of its right to decline to institute, but it does have authority to rule on a constitutional challenge to the statute? Or are you saying that, well, it can always decline and, thereby, avoid the problem altogether? Well, Your Honor, I think, I mean, it's clear that Congress authorized the agency to make institution decisions. My question really goes to whether the board, if the board wants to be perfectly transparent about this and say, we would institute this, but for the fact that we think that statute is unconstitutional and we think it's unconstitutional, therefore, we decline to institute. Is that a lawful act, in your view, in the view of the Department of Justice, for the board to take? Yes, Your Honor. It is? We think the board could issue a decision when it declines to institute, sorry, that if the board agreed with the constitutional challenge, it could decline to institute and issue a decision explaining that the reason it was declining to institute is because... And that would be unreviewable under CROSA by us? Yes, Your Honor, I do think that because that's committed to the agency discretion, that if the agency found that there was a constitutional problem, that would be unreviewable. But, of course, the agency has addressed this issue in a different case that is also pending before this court. And there, the agency rejected the retroactivity challenge, and the issue is now properly presented to this court in that case. And that, obviously, is reviewable. If there are no further questions, thank you. I'll start with the constitutional issues. The court obviously can see this here, the case in the interest of justice, if it believes it's important and proper to do so. The property interest here is broader than the government is professing. It's not just those who have invalid patents. It's all patent holders on the same regulatory disability of having to deal with a quasi-judicial, additional judicial administrative process. A process that has a lower bar to institution than the substantial new question of patentability line that was drawn for examination. And that also has the additional disability of having institution be granted when there's competing testimony. Under 42 CFR 108, when the board is confronted with conflicting expert testimony on an issue, it is instructed to weigh that in favor of institution. So the bar is lower. Suppose that Congress decided that the clearing convincing evidence test in district court was really too onerous for patent challengers and decided to convert the test into one by a preponderance. Do you think that would be constitutionally invalid? If retroactively applied? Yes, on the basis of retroactivity, I would. I would also believe that that's the case. At some point, the process drives the results. The fact that this IPR has been so popular should tell us all that maybe something's different than it was with the old re-examination regime. And patent holders certainly feel that way. It changes the calculus for licensing negotiations. I represent two cancer institutes. Every day, they're on the lines with licensing decisions. And those decisions are affected by the fact that a large pharmaceutical company can just throw you into re-exam or IPR and have to go through a mid-six-figure challenge before you get to enforce, like we have here. I'd like to turn just for a couple more points on a couple things about SINEA. Of course, it's critical that there's a difference between proteins and tyrosine kinases. SINEA does not identify what tyrosine kinases have been inhibited. How could someone of ordinary skill in the art know that it's a tyrosine kinase inhibitor without knowing what the tyrosine kinases that are being inhibited? That's the point. This evidence doesn't get us far enough to make the leap. There's inferences upon inferences upon inferences. And I want to close with the cell cycle. I've got a minute. The irony of this case is that this is a classic hindsight reconstruction. If you look at Akinaga, Akinaga talks about cell cycle and says that Akinaga says that the fact that compound A, MMC, and compound B, UCN01, act on two different parts of the cell cycle is a good thing because perhaps it's a one-two punch. The fact that one's not interfering with the other is a good thing. Whatever Akinaga thought, that's what it said. That was the state of the art. The inventors here believed that tyrosine kinase inhibition was a counteracting move. They saw the cell cycle arrest in G2 to be a negative, not a positive. And they went looking for a drug that would counteract that negative aspect. That's contrary to what Akinaga was looking at. When we talk about the problem to be solved, Akinaga was looking at it way different than the inventors of the 512 PAC part. Thank you. We thank both sides and the case is submitted.